In re **PINE LAKE VILLAGE APARTMENT CO., Debtor.**

**Bankruptcy No. 81 B 20737.**

**Adv. No. 82 6001.**

United States Bankruptcy Court, S. D. New York.

April 23, 1982.

Burns & Fox, New York City, for debtor.

Zalkin, Rodin & Goodman, New York City, for Thomas J. Hartigan; Andrew D. Gottfried, New York City, of counsel.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor in this Chapter 11 case, a limited partnership owning a multi-apartment house complex, opposes its mortgagee's request for relief from the automatic stay imposed under 11 U.S.C. § 362. The debtor concedes that it has no equity in the apartment house complex, which is its sole asset, since the mortgage principal amounts to $10,400,000, exclusive of interest, whereas the uncontradicted value of the property is approximately $6,400,000. The only creditors, other than the mortgagee, are trade creditors whose claims, aggregating approximately $44,952.06, would have been paid in due course but for the filing of the Chapter 11 petition.

The debtor contends that relief from the stay should not be granted because the mortgagee is adequately protected and there is a likelihood of reorganization. The adequate protection factor is based upon the assumption that if the debtor continues to maintain and repair the premises, so that there would be no physical deterioration of the property during the short run, the debtor should be afforded an opportunity during that period to proceed with its plan of reorganization, since its maintenance of the status quo under the matured mortgage that is now in default should adequately protect the mortgagee from any depreciation of its collateral. The debtor additionally contends that since the mortgagee is an undersecured creditor it cannot claim the right to interest under 11 U.S.C. § 506(b) and, therefore, the concept of adequate protection does not require any allowance for interest, even on the secured portion of the mortgagee's claim. This position is based on the theory that adequate protection simply means that there should be no further deterioration of the collateral and that the secured claim holder need not be compensated for the purported loss of its bargain during the continuance of the automatic stay.

Crucial to the debtor's position is the assertion that there exists a likelihood of reorganization. The mortgagee contends that the debtor's plan cannot be confirmed because no plan may be confirmed over the mortgagee's rejection. Apart from the relatively small class of unsecured trade creditors, the mortgagee is the debtor's only other creditor. The mortgage has matured by its own terms and now is in default. Since the collateral securing the mortgage is valued at $6,400,000, whereas the principal amount of the mortgage is $10,400,000 exclusive of interest, the bifurcation of claims principle under 11 U.S.C. § 506(a) comes into play with the result that the mortgagee is the holder of two claims, a secured claim for approximately $6,400,000 and an unsecured claim in excess of $4,000,000. The mortgagee contends that if it rejects the debtor's plan, as it announced it will, the debtor will be precluded from at-

taining the requisite majority for acceptances as required under 11 U.S.C. § 1126, for both the secured and unsecured claim holders.

The debtor maintains, however, that it expects to obtain acceptances from its trade creditors, since they are offered 100% repayment under the debtor's plan. Therefore, the debtor reasons that it will be able to obtain the acceptance of at least one class of creditors, as required under 11 U.S.C. § 1129(a)(10), so that the debtor may cram down its plan for confirmation, notwithstanding the rejection by the holder of the largest secured and unsecured claims against this estate.

Accordingly, the fulcrum upon which the debtor supports its case is the soundness of the proposition that the debtor's trade creditors may be characterized as a separate class of unsecured creditors whose consent to the debtor's plan will satisfy the requirement under 11 U.S.C. § 1129(a)(10) that there exist at least one consenting class of creditors. There is also another issue which the parties have not addressed, namely, whether or not the debtor may confirm a plan that proposes payment to its largest nonconsenting unsecured creditor of something less than the allowed amount of its claim at the time of confirmation, and yet permits the debtor's general and limited partners to retain their interests.

## FACTS

1. The debtor is a limited partnership owning a multi-apartment house complex in Lindenwold, New Jersey which is encumbered by a first mortgage of approximately $14,000,000. The debtor's schedules list the book value of the property at $5,540,082.00. The debtor's only general partner is a corporation.

2. On December 23, 1981, the debtor, Pine Lake Village Apartment Co. filed a petition in this court for relief under Chapter 11 of Title 11, United States Code.

3. The mortgage covering the debtor's premises was originally held by the Chase Manhattan Mortgage and Realty Trust ("CMART"). On June 25, 1974 a Consolidated Modification Agreement was entered into consolidating various outstanding mortgages into one single first priority mortgage lien upon the premises in question as security for a restructured indebtedness of $10,400,000.

4. The Consolidated and Modification Agreement provides, among other things, that the indebtedness of $10,400,000 would bear interest at the rate of nine percent per annum payable monthly out of Net Cash Flow (as defined therein) on the twentieth day of each month until March 1, 1982 when all unpaid principal and accrued interest would be due and payable. To the extent that Net Cash Flow was insufficient to pay interest at the stated rate, such interest was to accrue and would be payable at maturity.

5. The term net cash flow is defined in the mortgage to mean the rental and other income from the premises after the payment of the operating expenses, which would include the debtor's obligations to trade creditors. An exhibit annexed to the Consolidation and Modification Agreement provides that if "the prior month's . . . rental and other income derived from the operation of the Premises after the payment of the operating expenses (the Net Cash Flow) is insufficient to pay interest at the Interest Rate, the amount by which said interest exceeds Net Cash Flow shall accrue."

6. On April 24, 1980, CMART assigned all of its interest in the mortgage note to the plaintiff in this case, as Trustee of the Twenty Seven Trust under a certain Trust Agreement dated May 1, 1980.

7. The mortgage matured in accordance with its terms on March 1, 1982 and is now in default. The per diem rate of interest under the mortgage at 9 percent per annum is $2,564.38. The per diem rate at 12 percent, which is the New Jersey rate for interest on mortgage foreclosure judgments, is $3,419.18.

8. The uncontroverted evidence at the trial established that the premises are presently worth $6,400,000, as contrasted with a mortgage principal, exclusive of interest, of

$10,400,000. The amount owed on the mortgage as of the filing of the Chapter 11 petition is listed in the debtor's schedules as $13,818,353. Hence, the mortgagee is undersecured and the debtor lacks equity in the property.

9. The mortgagee testified that he would reject the debtor's plan of arrangement which proposes payment over a period of thirty years.

10. The debtor has submitted a plan of reorganization that separately classifies creditors into four classes. The first class embraces wage claims. The second class covers the mortgagee's secured claim. The sole member of this class is the plaintiff. The third class relates to unsecured creditors holding claims arising from the prepetition operations of the business of the debtor; its trade creditors. The fourth class is comprised of the partnership interests of the general and limited partners of the debtor.

11. The plan proposes that the wage claimants in class one and the trade creditors in class three will be paid in full in cash upon the effective date of the plan and are unimpaired. Significantly, the plan also provides that the "partnership interests of the general and limited partners in Class '4' shall be left unaltered and are unimpaired hereunder."

12. The plan further provides that the mortgagee in Class two shall receive $350,000 in cash on the effective date of the plan. Additionally the mortgagee shall receive on account of its allowed claim a note issued by the debtor for the balance, with interest at the rate of 15.75% percent per annum, in monthly installments commencing one month after the effective date of the plan and continuing for thirty years thereafter.

13. The plan also proposes that the present equity security holders of the debtor will contribute pro rata the sum of $700,000 in cash to enable the debtor to make the payments required under the plan and to furnish operating capital and to permit performance of repairs and rehabilitation of the premises in question.

## DISCUSSION

### Adequate Protection

■ In those cases where there existed a so-called equity cushion, in that the value of the collateral exceeded the amount of the secured claim, it has been held that such equity cushion alone may suffice for the purpose of adequately protecting a secured claim holder during the period in which the automatic stay under 11 U.S.C. § 362 continued in effect. *In re Pitts*, 2 B.R. 476 (Bkrtcy.C.D.Cal.1979); *In re Rogers Development Corp.*, 2 B.R. 679, 5 B.C.D. 1392 (Bkrtcy.E.D.Va.1980); *In re San Clemente Estates*, 5 B.R. 605, 6 B.C.D. 838, 2 C.B.C.2d 1003 (Bkrtcy.S.D.Cal.1980); *In re Shockley Forest Industries, Inc.*, 5 B.R. 160, 6 B.C.D. 642, 2 C.B.C.2d 756 (Bkrtcy.M.D.Ga.1980). However, the absence of an equity cushion need not be fatal. Obviously if a debtor were able to obtain a surety bond for the protection of a secured claim and in an amount substantially in excess of the claim, the secured claimant would be hard pressed to assert that it was not adequately protected, notwithstanding the absence of an equity cushion. In such circumstances, even though the debtor could not then establish that an effective reorganization was likely, the debtor would be permitted a limited time in which to attempt to effect rehabilitation since the secured claimant would be adequately protected during that period and would not stand to lose any portion of its secured interest; the surety bond would compensate the creditor for any loss.

The debtor's concept of adequate protection is not as expansive or as extreme as the above illustration. The debtor confines its offer of adequate protection to the extent that this term is described in 11 U.S.C. § 361, namely protection against "a decrease in the value" of the creditor's interest in the secured property. The debtor reasons that as long as it comes up with sufficient funds to repair and maintain the apartment house complex and sustains or enhances the physical status quo it should be allowed to have the automatic stay con-

tinued for a limited period while it endeavors to effect a confirmation of its plan of reorganization.

### Decreasing Value of Collateral

Section 362(d)(1) of the Bankruptcy Code prescribes a remedy for a creditor who seeks relief from the automatic stay imposed by § 362(a). After notice and a hearing, the court may terminate the stay "for cause, including the lack of adequate protection of an interest in property . . . ." [§ 362(d)(1)]. Neither the legislative history nor the Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt. This conclusion is supported by the following statement contained in the Senate Report accompanying the 1978 Bankruptcy Reform Act:

> "Adequate protection in the form of either cash payments or a replacement lien must be provided the creditor *whose collateral is decreasing in value or is being consumed during the stay.* S.Rep.No.95–989, 95th Cong., 2nd Sess., p. 4, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5790. [Emphasis added]

Section 361[1] of the Code suggests three ways in which adequate protection may be provided for a creditor although these methods are not exclusive of other means.

The third method, [§ 361(3)] will not be discussed in any detail herein other than to note that it calls for the granting of relief to an entity allowing such entity to realize the "indubitable equivalent" of its interest in property, although the meaning of this arcane language is not altogether clear.

The first method [§ 361(1)] of providing adequate protection calls for periodic cash payments to the extent that the stay imposed under § 362 *"results in a decrease in the value"* of an entity's interest in property. This provision codifies the decision in *In re Bermec Corporation*, 445 F.2d 367 (2d Cir. 1971), where a debtor under Chapter X of the former Bankruptcy Act was required to furnish adequate protection to secured creditors who were demanding immediate lien enforcement in order to protect their interests in rapidly depreciating collateral. The *Bermec* court noted:

> "We are conscious of the deep concern of the manufacturing secured creditors lest their security depreciate beyond adequate salvage, but we must balance that with the Congressional mandate to encourage attempts at corporate reorganization where there is a reasonable possibility of success." 445 F.2d at 369.

The court approved the debtor's plan of reorganization that provided for payments to the creditors for the "economic depreciation on the secured creditors' equipment so as approximately to preserve their status quo." *Id.*

The second method [§ 361(2)] provides for the granting of an additional or replacement lien, again *to the extent that the stay results in a decrease in the value of the creditor's interest in the property.* The legislative history explains that

> "[T]here may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the policy of the bankruptcy laws. Thus, this section recognizes the availability of protect-

---

1. § 361. Adequate protection.
 When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property such adequate protection may be provided by—
 (1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

ing a secured creditor's interest where such steps are a necessary part of the rehabilitative process. Though the creditor might not be able to retain his lien upon the specific collateral held at the time of filing, the purpose of the section is to insure that the secured creditor receives the value for which he bargained." H.R.Rep.No.95–595, 95th Cong., 1st Sess., p. 339 (1977), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 6295.

This concept is derived from *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), in which the court opined that the protection to be afforded a secured creditor is to ensure his receipt of at least the value of the property, if not the specific collateral itself, and that "there is no constitutional claim of the creditor to more than that", 311 U.S. at 278, 61 S.Ct. at 199. An earlier decision involving the same debtor, *Wright v. Vinton Mountain Trust Bank*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937) concerned the constitutionality of a revised version of the Frazier-Lemke Act,[2] § 75(s) of former Bankruptcy Act, August 28, 1935, Chap. 792, 49 Stat. 943–5, 11 U.S.C. § 203. The Act provided for a three year moratorium period in which the mortgagee was forestalled from foreclosure in order to permit a farmer-debtor to remain in possession of the property subject to the requirement that he pay "a reasonable rent semiannually for that part of the property of which he retains possession", [§ 75(s)(3)]. At the end of the three years or prior thereto, the debtor had the opportunity to redeem the property at its appraised value, notwithstanding the fact that the land might be worth much less than the total indebtedness due the secured creditor. [§ 75(s)(3)]. The right of the secured creditor to a public sale, also provided for in § 75(s)(3), was limited to those instances where the debtor failed to redeem at the appraised price. Congress recognized the necessity for including some measure of

protection for the creditors' property interests, should the security begin to diminish in value. Thus, § 75(s)(2) provided that the court could, in its discretion, require (in addition to the rental) payments on the principal due and owing to the secured creditor to prevent loss and to conserve the security. Hence, it is noteworthy that the secured creditor was constitutionally entitled to receive no more than the appraised value of the secured property in satisfaction of the debt, *absent any decline in the value of the collateral.*

■ The above cited cases are in accord with the view expressed in *In re Alyucan Interstate Corp.*, 12 B.R. 803, 7 B.C.D. 1123, 4 C.B.C.2d 1066 (Bkrtcy.D.Utah 1981) that "'the interest in property' entitled to protection is not measured by the amount of the debt but by the value of the lien." 12 B.R. at 808, 7 B.C.D. at 1125, 4 C.B.C.2d at 1070. The court noted that pursuant to § 506(a) of the Code, the value of a lien is the amount of the allowed secured claim. Thus, if a creditor is undersecured, the lien will be equal to the value of the collateral. Where he is oversecured, it is the amount of the debt plus interest and expenses. [§ 506(b) ]; accord, *In re Kingman Warehouse Co. IX*, 17 B.R. 377, 379 (Bkrtcy.N.D. Iowa 1982).

■ The *Alyucan* court observed that adequate protection furnished to a creditor pursuant to § 361 assures the maintenance, and thus, recoverability of the lien value in the interim between the filing of the petition and acceptance of the plan of reorganization. Accordingly, a secured creditor has the right to receive adequate protection for any decline in value the collateral may suffer after the automatic stay is in effect, since but for the stay, the creditor could foreclose to prevent or mitigate any loss in the value of the security.

---

**2.** The Frazier-Lemke Act was a temporary emergency farmer relief Act enacted during the Depression when farms were being foreclosed throughout the nation at an alarming rate. The first Frazier-Lemke Act, 48 Stat. 1289 (1935)

was declared unconstitutional by the Supreme Court the same year, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

■ However, if the value of the collateral is not depreciating during the stay, or if the loss is not attributable to the stay, the debtor should not be required to furnish the creditor with any further protection for his lien, especially in light of the legislative history and the provisions of the Code where the express purpose is concerned with the preservation of the collateral securing the creditors' claims.

It is clear that if there is no diminution in the value of the security, then the security is not impaired and the secured creditor cannot succeed in his demand that the debtor furnish additional protection. *In re Blazon Flexible Flyer, Inc.*, 407 F.Supp. 861 (N.D.Ohio 1976); *In re American Kitchen Foods, Inc.*, 2 B.C.D. 715 (Bkrtcy.N.D.Maine 1976); *In re Reconstruction Finance Corp. v. Kaplan*, 185 F.2d 791 (1st Cir. 1950); *In re Continental Illinois Nat. Bank & Trust Co. of Chicago v. Chicago R.I.&P. Ry. Co.*, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

■ In the instant case, the debtor's property that secures the mortgagee's claim is experiencing no depreciation and in fact is arguably being enhanced in value, as the debtor has been using cash collateral in the form of post-petition rents, with this court's permission [*In re Pine Lake Village Apartment Co.*, 16 B.R. 750 (Bkrtcy.S.D.N.Y. 1982)], solely to maintain and repair the property which serves as collateral for the plaintiff-mortgagee's claim. Use of the funds in this fashion should normally ensure adequate protection for the mortgagee's interest in the premises. As the court in *In re American Kitchen Foods, Inc., supra*, recognized, the "use of collateral to the extent necessary to preserve or enhance the value of the collateral represents no impairment." 2 B.C.D. at 719. In addition, the value of the property securing the plaintiff's claim is increasing to the extent of unspent rental income being accumulated in segregated cash collateral accounts. Furthermore, all required payments are being made currently for taxes and insurance premiums, and the rent proceeds would ordinarily have been remitted to the mortgagee, but for the mortgage provision that requires only net rent proceeds over and above operating expenses to be turned over to the mortgagee for application to the indebtedness. However, as previously noted, these rent proceeds are being used for maintenance of the premises and serve to protect the mortgagee's collateral.

Accordingly, the present scenario is distinguishable from that in *In re El Patio, Ltd.*, 6 B.R. 518, 6 B.C.D. 1098 (Bkrtcy.C.D. Cal.1980), where adequate protection in the form of cash payments was required to preserve the value of the secured portion of an undersecured creditor's lien. The court reasoned that accruing unpaid taxes and penalties would constitute a lien of first priority ahead of the secured interest, thereby eroding the value of the property securing this interest, since the collateral would have to be first applied to satisfy the tax lien. See also *In re Monroe Park*, 17 B.R. 934 (D.C.Del.1982).

The present case at bar is therefore not representative of a situation where collateral securing a debt is deteriorating, causing impairment of the secured claim holder's lien. Thus, it is unnecessary in light of the case law, legislative history and Code provisions to require the debtor to furnish additional protection to the mortgagee for any depreciation of the secured portion of its undersecured claim.

However, there remains unanswered whether or not the undersecured creditor should be entitled to compensation concerning the secured portion of its allowed claim because of the delay in its realization.

### Delay in Realization of the Secured Claim

■ Code § 506(b) authorizes the payment of interest on an allowed secured claim if such claim "is secured by property the value of which ... is greater than the amount of such claim ...". Since this provision only applies to oversecured claims, it follows that interest on all other prepetition claims stops accruing as of the date of the filing of the petition in accordance with the disallowance of unmatured interest expressed in 11 U.S.C. § 502(b)(2). Therefore,

if postpetition interest on the allowed portion of a secured claim is not expressly called for under the Code, is it, nevertheless, required in the context of adequate protection?

This issue was addressed in *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635 (Bkrtcy., E.D.N.Y.1980); *In re Monroe Park*, 17 B.R. 934 (D.C.Del.1982), and *In re Virginia Foundry Co., Inc.*, 9 B.R. 493 (D.C.W.D.Va. 1981). These courts support the proposition that a secured claimant is entitled to adequate protection during the interval between petition and confirmation as compensation for the loss of use of its money which is tied up in the real estate, since but for the automatic stay, the creditor could foreclose the mortgaged property and reinvest the proceeds for a greater return at current interest rates. The *Monroe Park* case, *supra*, indicated that this right of recourse to the collateral was an important part of the value of the secured claimant's interest in property which must be fully protected.

However, this viewpoint elides the fact that the Code's concept of adequate protection does not contemplate maintaining a secured claim holder in the position he could have been in had the stay not intervened. Rather, as explained earlier, adequate protection is required solely to compensate for a decrease in the value of the collateral securing the claim.

A mortgage transaction is a voluntary undertaking; the lender participates with the understanding that the mortgage contract creates a relationship that extends over a number of years. Hindsight gained during a particular business cycle that is producing high interest rates undoubtedly causes a mortgagee to reflect on the profound lack of wisdom accompanying his decision to enter into the earlier venture. However, as long as the collateral value remains stable the debtor cannot be called upon to compensate the mortgagee for the delay he must endure before parlaying his foreclosure proceeds into a better investment. Adequate protection relates to preservation of the collateral value, and not to compensation for the loss of a better business opportunity. As long as the collateral value is constant, the mortgagee will receive the benefit of his bargain.

The *In re American Mariner Industries, Inc.* case, 10 B.R. 711 (Bkrtcy.C.D.Cal.1981) finds fault with the *Anchorage* decision, *supra*, observing that the rationale presented in *Anchorage* for the notion of protecting the secured claim holder from delay in realizing his claim, was based on the necessity for the creditor to receive the "indubitable equivalent" of the value of its collateral, *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935), and the reasoning that payment in the future was not the equivalent of payment now. *Id.*

The *Monroe Park* court, *supra*, agrees with the *Anchorage Boat* rationale and joins it in citing the *Murel Holding Corp.* decision's "indubitable equivalent" language.

However, the *American Mariner* court cogently points out that the *Murel* case concerned an undersecured creditor who was being "crammed down" *at confirmation.* Thus, Judge Learned Hand discussed the issue of adequate protection for this creditor in the context of the *confirmation standards* that had to be met under § 77B of the former Bankruptcy Act before a reorganization plan could be confirmed. [See *Murel* at 942, 943]. It was not a discussion of the adequate protection that might be appropriate to protect a secured claimant from the delay in realizing his claim in the interval *prior to confirmation.*

Therefore, the holding in *Murel* in which Judge Learned Hand stated at page 942 that " 'adequate protection' must be completely compensatory; ... that payment ten years hence is not generally the equivalent of payment now", and that a secured claimant was entitled to the "indubitable equivalence" of his interest in the debtor's property, was distinguished in *American Mariner, supra*, at 712 in that it:

"may be precedent for issues arising upon *confirmation* under § 1129(b)(2)(A)(i)(II), but not to require interest to be paid to an undersecured creditor for being tem-

porarily deprived of possession or use of its collateral." [Emphasis added].

■ Moreover, an oversecured creditor should not be granted more protection during the delay prior to confirmation if the collateral value is not decreasing since, in effect, he is compensated for this interval under Code § 506(b). This section entitles him to collect interest on his claim so that whatever interest accumulates during the interim prior to confirmation will be added to his secured claim awaiting distribution under the debtor's plan. Therefore, he is protected during this period not under an adequate protection concept, but rather by his entitlement to interest on his claim under 11 U.S.C. § 506(b). Indeed, the *Monroe Park* court observed that

> "It may be that compensation for unpaid accruing interest charges during the pendency of the bankruptcy proceedings is not necessary in all cases. See *In re BBT*, 11 B.R. 224, 232 (D.Nev.Bkrtcy. 1981). Indeed, adequate protection is a flexible concept which requires a Court to make decisions in a case-by-case basis, after full consideration of the peculiar characteristics common to each proceeding" 17 B.R. at 940.

Although it is true that an undersecured creditor does not recover interest on his claim and thus would ultimately receive no compensation for the interim period, this cannot be construed as unfair since 11 U.S.C. § 506(b) makes no provision for interest to be added to the secured claim of an undersecured claimant. Indeed, the proper remedy to be afforded secured claim holders for undue delay in realizing their claims would lie in a motion to dismiss the Chapter 11 petition or convert it to a Chapter 7 case under § 1112(b), should the debtor be unable to effectuate a reorganization

plan within a reasonable time. *American Mariner* 10 B.R. at 713.

*Separate Classes of Unsecured Creditors*

Having concluded that a secured interest may be adequately protected by the maintenance of the status quo, notwithstanding that the debtor lacks equity in the property, and having also determined that an undersecured creditor need not be paid interest on the secured portion of its claim for purposes of adequate protection, there nevertheless is another point to be considered in this case within the context of 11 U.S.C. § 362(d)(1). Under these circumstances, should the automatic stay be lifted for cause, or for lack of adequate protection, when the debtor seeks a continuance of the stay, while maintaining the status quo, in order to confirm a plan that separately classifies two groups of unsecured creditors, thus forcing a cram down of the matured mortgagee under a plan of reorganization that it would otherwise not voluntarily accept.

■ The debtor argues that there is a reasonable basis for separately classifying the trade creditors who will be repaid in full so that they will be deemed to have accepted the plan as authorized under 11 U.S.C. § 1126(f).[3] There is no question that if the trade creditors are to be fully paid, and if they are permitted as a separate class, their legal, equitable and contractual rights will remain unaltered so that the trade creditors' claims will be regarded as unimpaired for purposes of 11 U.S.C. § 1124(1).[4] However, if the debtor can only produce one accepting class and that class is deemed to have accepted the plan, confirmation will not be achieved because the requirement under 11 U.S.C. § 1129(A)(10) that at least one class of claims must accept

---

3. § 1126. Acceptance of plan.

· · · · ·

 (f) Notwithstanding any other provision of this section, a class that is not impaired under a plan is deemed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interest of such class is not required.

4. § 1124. Impairment of claims or interests. Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

 (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

the plan[5] will not be met. At least one affirmatively accepting impaired class is required; a deemed accepted class will not suffice. *In re Marston Enterprises*, 13 B.R. 514, 7 B.C.D. 1403 (Bkrtcy.E.D.N.Y.1981); *In re Barrington Oaks*, 15 B.R. 952, 8 B.C.D. 569, 5 C.B.C.2d 969 (Bkrtcy. Utah 1981); *In re Economy Cast Stone Co.*, 16 B.R. 647, 8 B.C.D. 807 (Bkrtcy.E.D.Va.1981). Therefore, as the debtor's plan now stands, it cannot pass muster under 11 U.S.C. § 1129(a)(10).

If the debtor were to amend its plan so as to impair the rights of the trade creditors, such as by offering less than full payment on confirmation, or by providing for full payment over an extended period of time, and further assuming that this impaired class affirmatively accepted the plan, there would nevertheless remain for consideration whether or not such a class may be treated separately when it does not include the mortgagee's allowed unsecured deficiency claim in excess of $4,000,000.

Obviously the debtor cannot include the mortgagee's unsecured claim in one class with trade creditors because the mortgagee would then represent most of the unsecured claims in this class. Since the debtor does not and cannot pay the mortgagee's allowed deficiency claim in full on confirmation, this class would be regarded as impaired within the meaning of 11 U.S.C. § 1124. Therefore the debtor would then require the acceptance of this class for confirmation purposes, as provided under 11 U.S.C. § 1129(a)(8)(A).[6] The mortgagee's rejection of the debtor's plan, as announced by it, would prevent the requisite acceptances under 11 U.S.C. § 1126(c).[7]

The debtor urges that there is a logical basis for separately classifying the trade creditors. The consolidated mortgage under which the mortgagee asserts its claim provides that the repayment of principal and interest shall be made from the cash flow from the property. The net cash flow is defined as all of the income from the property, less the operating expenses, which would include debts owed to trade creditors. Therefore the mortgagee's right to receive income from the mortgage property towards reduction of principal and payment of interest is subject to the debtor's right to deduct for obligations and expenses incurred to trade creditors in the management of the debtor's business. Thus, the debtor reasons that its obligation to pay trade creditors from the gross income before making payments to the mortgagee results in subordinating the mortgagee's rights to those of the trade creditors, which subordination should carry over beyond the filing of the Chapter 11 petition so that the mortgagee's deficiency claim should be subordinated to the rights of the trade creditors. Hence, it might be argued that there is a reasonable basis for separately classifying and elevating trade creditors' unsecured claims over those of the mortgagee's unsecured deficiency claim.

In determining the designation of classes, reference must be made to 11 U.S.C. § 1123(a)(1) which requires that a plan shall designate, subject to Section 1122, classes of claims and classes of interests. This section is silent as to the manner in which the separate classes are to be designated nor does it reflect an authorization for designating several classes of unsecured claims as permitted in a Chapter 13 case pursuant

---

**5.** § 1129. Confirmation of plan.

. . . . .

(10) at least one class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

**6.** § 1129. Confirmation of plan.

. . . . .

(8) With respect to each class—
(A) such class has accepted the plan; or
(B) such class is not impaired under the plan.

**7.** § 1126. Acceptance of plan.

. . . . .

(c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

to 11 U.S.C. § 1322(b)(1). The classification of claims and interests, as distinguished from the designation of classes, is covered by 11 U.S.C. § 1122(a) which permits the placing of claims or interests in a particular class only if such claim or interest "is substantially similar to the other claims or interests of such class." Consistent with this treatment of claims in a particular class is the provision in 11 U.S.C. § 1123(a)(4) that the plan must provide the same treatment for each claim or interest in a particular class.[8] However, there is little guidance as to the designation of separate classes, except that 11 U.S.C. § 1122(b) does allow for administrative convenience a separate class that is less than or reduced to a dollar amount approved by the court as reasonable and necessary. This is the only exception expressed in the Code for separately designating unsecured claims. Any other designation would have to comply with 11 U.S.C. § 1129(b)(1) that prescribes as a prerequisite for confirmation that "the plan does not discriminate unfairly."

The classification of unsecured claims is described in 3 *Norton Bankruptcy Law and Practice*, Part 60—page 7 as follows:

"§ 60.05. Unsecured Claims.

Unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or *a deficiency of a secured creditor*. These unsecured claims have in common the fact that their remedies against the debtor are the same and the nonpriority unsecured creditors are entitled to share pro rata in values remaining after payment of secured and priority claims." [Emphasis added]

The debtor draws strength for its argument that the mortgagee subordinated its claim to those of the trade creditors from the following language in an exhibit attached to the Consolidation and Modification Agreement:

"Interest shall be payable monthly out of Net Cash Flow as hereinafter defined commencing on the 20th day of July, 1975, and on the 20th day of each month thereafter at the Interest Rate. If, however, the prior month's, or in the case of the first payment hereunder for the period from May 13th to June 30th, 1975, rental and other income derived from the operation of the Premises after the payment of the operating expenses (the Net Cash Flow) is insufficient to pay interest at the Interest Rate, the amount by which said interest exceeds Net Cash Flow shall accrue. To the extent that the Net Cash Flow for the month is in excess of the interest, said excess shall be applied first to the payment of any interest hereon which accrues as provided above, then to interest accrued and unpaid prior to the date of the instrument (the Consolidation Agreement) to which this Exhibit B is attached and lastly to the prepayment of principal. The accrued interest, mentioned above, shall not be grounds for foreclosure or pursuit of other remedies available pursuant to the terms of the Consolidation Agreement, nor shall such accrued interest bear any additional interest or penalty. At the Maturity Date, the entire unpaid balance of principal and interest accrued and unpaid hereunder shall become due and payable."

 In order for there to be a consensual or contractual subordination, there first must exist an agreement where a creditor and a debtor agree to create priorities among debts. "Such agreements have been uniformly enforced according to their terms by bankruptcy courts." *In re Credit Industrial Corporation*, 366 F.2d 402 at 409 (2d Cir. 1966). The enforcement of such an agreement does not offend the policy of equal distribution of the creditor's estate because this policy "means no more than that dividends paid to creditors shall be pro rata except where there is a priority given by law or by lawful contractual arrangement between the parties." *In re Aktiebolaget Kreuger & Toll*, 96 F.2d 768 at 770 (2d

---

8. § 1123. Contents of plan.
 (a) A plan shall—
 (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

Cir. 1938). See also *In re Credit Industrial Corporation*, supra.

■ The so-called subordination language urged by the debtor clearly expresses an understanding that if the Net Cash Flow (including payments to trade creditors) exceeds the monthly interest obligation due the mortgagee, the excess interest amount shall accrue, but such unpaid interest shall be due and payable at maturity. This language merely postpones unavailable monthly interest in favor of operating expenses. There is no hint of any intention to subordinate the mortgagee's principal indebtedness to the claims of trade creditors. Indeed, the interest is not forgiven, it is merely postponed to maturity when "the entire unpaid balance of principal and interest accrued and unpaid . . . shall become due and payable." Accordingly, the debtor's contention that the mortgagee contractually subordinated his claim for principal and interest under the matured and defaulted mortgage to the claims of trade creditors is without merit. Therefore, there is no justifiable basis for creating two classes of unsecured creditors and classifying the unsecured trade creditors separately.

■ The creation of separate classes of unsecured and unsubordinated claims in order to allow gamesmanship in vote getting is not condoned under the Code. Indeed, a deficiency claim arising out of a secured interest in property is expressly treated as a recourse claim in 11 U.S.C. § 1111(b), even though the claim may be nonrecourse by agreement or applicable law. The recognition of the deficiency claim as entitled to the same treatment as all other unsecured claims under a debtor's plan would be undermined if debtors were permitted to classify separately such deficiency claims. The debtor may not ignore the rejection of its plan by the holder of a large unsecured deficiency claim simply be-

cause the debtor designated a specially preferred separate class of easily created trade creditors whose acceptances may be readily obtainable by offering them more than the disfavored deficiency claim holder. Manifestly such treatment of unsecured claims is unfairly discriminatory within the meaning of 11 U.S.C. § 1129(b)(1).

*Compliance With Chapter 11 Provisions*

There is yet a more fundamental reason why the debtor cannot hope to achieve a confirmation in the face of the mortgagee's rejection of the debtor's plan. Unfortunately the parties did not address this issue. Even if the debtor were able to classify the mortgagee's deficiency claim separately from the unsecured trade claims, the proposed plan does not comply with the provisions of Chapter 11.

■ Since the debtor's plan proposes to repay the mortgagee's claim over a period of thirty years, such claim is not within the impairment exclusion under 11 U.S.C. § 1124(1)[9] because its legal, equitable and contractual rights to immediate payment will be altered. Moreover, since the proposed repayment of the deficiency claim will not be made in cash on the effective date of the plan to the extent of the allowed amount, the mortgagee's claim will not fall within the exclusion for full cash payment under 11 U.S.C. § 1124(3)(A).[10] Hence, the mortgagee's claim must be regarded as impaired. An impaired nonconsenting class of unsecured creditors may not be offered less than the allowed amount of its claim valued at confirmation under U.S.C. § 1129(b)(2)(B)(i) unless the plan meets the "fair and equitable" test under the Code.

The concept of "fair and equitable", as applied to a class of unsecured claims that is impaired and does not consent is expressed in 11 U.S.C. § 1129(b)(2)(B) as follows:

9. See footnote 4.

10. § 1124. Impairment of claims or interests.

. . . . .

(3) provides that, on the effective date of the plan, the holder of such claim or interest re-

ceives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim;

"§ 1129. Confirmation of plan.

. . . .

(B) with respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property."

The debtor's plan lumps together the mortgagee's secured claim and the unsecured deficiency claim and provides that after the payment of $350,000 in cash on confirmation, the unpaid balance will be repaid to the mortgagee over a period of thirty years in self-liquidating monthly payments of principal and interest in accordance with the terms of a note that would be given to the mortgagee, made payable by the debtor, with interest at the rate of 15.75 per cent per annum. Deducting $350,000 from the $13,818,353 listed in the debtor's schedules as due to the mortgagee at the time the Chapter 11 petition was filed, there remains a balance of $13,468.353. It is mathematically calculable that this amount, payable over thirty years at the rate of 15.75 per cent per annum would call for a monthly payment of $178,404.49. The evidence at the trial revealed that the debtor's gross rental and other income totalled $2,261,662 per year, or $188,471.33 per month. The debtor's operating expense ratio was .538 per cent, or $101,397.84 per month. Therefore, the debtor's monthly net income of $87,073.49 ($188,471.33 minus $101,397.84) is woefully less than the carrying charges it proposes to pay under its note to the mortgagee.

Since the debtor is now operating its apartment complex at approximately 95 per cent of capacity, and is subject to local rent guidelines, it is clear that there are no

prospects for substantial additional rental income available to the debtor to make up the amount of $91,430.50, which is the difference between the monthly note requirement of $178,404.49 and the debtor's monthly net rental and other income of $87,073.49. Indeed, the monthly payment required under the note is more than double the debtor's current net income.

An additional factor involving this rate is the fact that the debtor is a limited partnership. Its sole general partner is a corporation also with limited liability. The debtor's only asset is the property in question, valued at approximately $6,400,000 and subject to a first mortgage of nearly $14,000,-000. In these circumstances, it is unassailable that if the mortgagee would sell this note to a bank, the mortgagee would not likely receive the face value. This discount factor must be considered because the debtor does not propose to pay the mortgagee's claim in full at confirmation. Insofar as the mortgagee's secured and deficiency claims are concerned, any amount that will be paid over a period of time must include a discount factor in order to arrive at the allowed amount as of the effective date of the plan. 11 U.S.C. § 1129(b)(2)(B)(i).

▮▮▮ In this case the debtor's limited partners comprise a class of equity interests that are regarded under 11 U.S.C. § 1129(b)(2)(B)(ii) as junior to the class of unsecured claims referred to in 11 U.S.C. § 1129(b)(2)(B)(i). The limited partners are treated as holders of equity interests because an "equity interest" is defined in 11 U.S.C. § 101(15)(B) to mean an "interest of a limited partner in a limited partnership." Similarly, a general partner's equity interest in an estate under the Code is regarded as junior to the rights of partnership creditors, as illustrated in a Chapter 7 case, where 11 U.S.C. § 723(a) provides that each general partner in a partnership is liable for full amount of any administrative expenses and all claims against the partnership.[11] Therefore, in accordance with the requirements under 11 U.S.C. § 1129(b)(2)(B)(ii), the general and limited partners of the

---

11. § 723. Rights of partnership trustee against general partners.

(a) If there is a deficiency of property of the estate to pay in full all claims allowed in a case under this title concerning a partnership, then

debtor, as holders of interests that are junior to the mortgagee's unsecured deficiency claim, may not receive or retain any interest or property unless the mortgagee's unsecured deficiency claim receives "property of a value, as of the effective date of the plan, equal to the allowed amount of such claim ...". 11 U.S.C. § 1129(b)(2)(B)(i).

█ In other words, a senior class must be paid in full if a junior class is to receive any property. See *In re Alison Corporation*, 9 B.R. 827, 7 B.C.D. 500, 4 C.B.C.2d 199 (Bkrtcy.S.D.Cal.1981); *In re Landau Boat Company*, 8 B.R. 436, 7 B.C.D. 255, 4 C.B.C.2d 307 (Bkrtcy.W.D.Mo.1981). This is precisely what the debtor does not propose to do. The debtor's objective for maintaining the automatic stay is that its general and limited partners will retain their interests while the mortgagee's secured and unsecured claims will receive something less than the value of their allowed amounts as of the effective date of the plan. The mortgagee is asked to accept a note drawn by the debtor, whose financial structure and responsibility is questionable, in payment for the balance due over a period of thirty years at 15.75 percent interest. In these circumstances, the note cannot realistically be valued as the indubitable equivalent of payment in full on confirmation. This is especially so in light of the fact that the monthly payments under the note are more than double the debtor's current net income. Therefore, the plan does not satisfy the "fair and equitable" test that the Code imposes for the protection of an impaired nonconsenting class. Under 11 U.S.C. § 1129(a)(1), a plan that does not comply with the applicable provisions of Chapter 11 cannot be confirmed.[12]

█ In view of the fact that the debtor opposes relief from the automatic stay in order to achieve an impermissible result, its offer to maintain and repair the premises in question, in order to continue the status quo does not constitute adequate protection of the mortgagee's interests. Indeed, the debtor's lack of equity in this estate and its unattainable objective under Chapter 11 constitute sufficient cause for granting the mortgagee's request for relief from the stay in accordance with 11 U.S.C. § 362(d)(1).

There is no question that the mortgagee has also satisfied the grounds for relief from the automatic stay that are delineated under 11 U.S.C. § 362(d)(2), because the debtor admittedly does not have any equity in its single asset apartment house complex as required under subsection (A). Both subsection (A) and subsection (B) must be met in order to satisfy the requirements under 11 U.S.C. § 362(d)(2) because these prerequisites are expressed in the conjunctive.[13] Therefore, the issue as to whether or not the property is "necessary to an effective reorganization" is academic, since, as previously indicated, no effective reorganization is attainable because the debtor's plan and objectives cannot comply with the applicable provisions of Chapter 11.

### CONCLUSIONS OF LAW

1. The debtor may not classify the mortgagee's deficiency claim under the matured and defaulted mortgage as a separate class of unsecured claims because such a classification discriminates unfairly, as proscribed under 11 U.S.C. § 1129(b)(1).

2. The mortgagee's announced rejection of any plan proposed by the debtor prevents

each general partner in such partnership is liable to the trustee for the full amount of such deficiency.

**12.** § 1129. Confirmation of plan.
 (a) The court shall confirm a plan only if all of the following requirements are met:
 (1) The plan complies with the applicable provisions of this chapter.

**13.** § 362. Automatic stay:

 . . . . .

 (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

 . . . . .

 (2) with respect to a stay of an act against property, if—
 (A) the debtor does not have an equity in such property; and
 (B) such property is not necessary to an effective reorganization.

834

the debtor from ever achieving confirmation because the debtor cannot obtain the consent of one impaired class of claims or interests, as required under 11 U.S.C. § 1129(a)(10).

3. No plan of reorganization is possible which has as its objective that the debtor's general partner and limited partners will retain their interests while the mortgagee's secured and deficiency claims will receive something less than the value of their allowed amounts as of the effective date of the plan, as proscribed under 11 U.S.C. § 1129(b)(2)(B)(ii).

4. The mortgagee is entitled to relief from the automatic stay for cause shown within the meaning of 11 U.S.C. § 362(d)(1) because the mortgagee is not adequately protected by a continuance of the status quo while the debtor endeavors to confirm a plan that cannot comply with the applicable provisions of Chapter 11, as required under 11 U.S.C. § 1129(a)(1).

5. The mortgagee has also established that the debtor lacks equity in the property in question and no effective reorganization is likely within the meaning of 11 U.S.C. § 362(d)(2).

6. The mortgagee's complaint seeking relief from the automatic stay is granted.

SUBMIT ORDER on notice.