In re BRIGGS TRANSPORTATION CO.

LEND LEASE, A DIVISION OF NATIONAL CAR RENTAL SYSTEMS, INC.

v.

BRIGGS TRANSPORTATION CO.

GENERAL MOTORS ACCEPTANCE CORP.

v.

BRIGGS TRANSPORTATION CO.

INTERNATIONAL HARVESTER CREDIT CORP.

v.

BRIGGS TRANSPORTATION CO.

Bankruptcy No. 3–83–141.
Adv. Nos. 3–83–0235, 3–83–0075 and 3–83–0074.

United States Bankruptcy Court, D. Minnesota.

Nov. 10, 1983.

David T. Bennett and John Patin, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for Lend Lease.

Gregory J. Pulles, Mackall, Crounse & Moore, Minneapolis, Minn., for General Motors Acceptance Corp.

Frank A. Dvorak, Minneapolis, Minn., for International Harvester Credit Corp.

James A. Rubenstein, O'Connor & Hannan, Minneapolis, Minn., for Briggs Transportation, Co.

## ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

These adversary proceedings involve the identical legal issue and, therefore, have been consolidated for the purposes of this opinion. These three adversary proceedings were brought by creditors seeking relief from the automatic stay. By stipulation, the parties agreed to allow the debtor to retain possession of certain collateral in exchange for adequate protection in the form of periodic payments. In all three cases, however, the creditors reserved for resolution by the court, the issue of whether they were entitled to interest, in addition to these periodic payments. That issue is now before the court on stipulated facts and written arguments of the parties.

Arguments were submitted on behalf of Lend Lease by David T. Bennett and Thom-

as J. Patin, on behalf of General Motors Acceptance Corp. ("GMAC") by Gregory J. Pulles and for International Harvester Credit Corporation ("IHCC") by Frank A. Dvorak (hereinafter collectively referred to as the "creditors").

James A. Rubenstein submitted the memorandum on behalf of Briggs Transportation Co. ("Briggs").

Based on the stipulations, arguments of counsel and all the files and records in these cases, the following memorandum order is made pursuant to Bankruptcy Rule 7052.

## MEMORANDUM ORDER

The essential facts are easily summarized. Briggs claims no equity in any of the collateral in which the creditors have a security interest. In addition, the creditors, for the purposes of this adversary proceeding, admit they are undersecured. The creditors, nevertheless, assert that they are entitled to interest as part of adequate protection.

More specifically, Lend Lease, according to its stipulation with Briggs, has a valid perfected security interest in 100 1982 Great Dane 45' dry trailers under an equipment lease agreement entered into by Lend Lease and Briggs on October 5, 1981. On May 6, 1983, when this proceeding was commenced, according to the lease agreement, each trailer had a depreciated value of 98.59% of its capitalized cost of $13,231.00. Briggs was not current on its obligation. Therefore, the delinquency would increase this figure.

In its stipulation, Lend Lease agreed that the current value of the trailers was $10,500 each. It is clear from these figures that Briggs has no equity in the property and that Lend Lease is substantially undersecured.

According to the stipulation entered into between Briggs and GMAC, Briggs agreed to return certain equipment and retain 50 1980 model TJ9C064 Tandem trailers ("tandems") and two 1981 Chevrolet Celebrities.[1]

---

1. The issue of additional interest payments as part of adequate protection was not raised with regard to the two automobiles also purchased by Briggs from GMAC. Briggs is current on these contracts and apparently plans to contin-

The tandems were originally purchased by Briggs pursuant to a series of installment sales contracts for 10 tandems each, entered into between September 21, 1980 and September 29, 1980. These contracts provided for a purchase price of $43,532.88 for each of the tandems. The parties have stipulated that the value of the tandems on February 1, 1983 was $14,500 each. Accordingly, Briggs again, has no equity in the collateral and GMAC is substantially undersecured.

At the time IHCC filed its complaint, Briggs had 50 1979 International Harvester model No. C0–4070B tractors. The purchase of the tractors is evidenced by a series of installment sales contracts entered into between Briggs and IHCC between June 28, 1979 and September 29, 1979. These contracts provide for the purchase of tractors over a 60 month period for $31,164 each. At the time the adversary proceeding was commenced, Briggs was three months delinquent on these contracts, in addition to having obtained extensions for several prior months' payments. According to the terms of the purchase agreements, the debt for each tractor was in excess of $11,400 plus the delinquent payments. The stipulation between Briggs and IHCC provide for Briggs to retain 15 of the 50 units. The parties agreed for the purpose of this adversary proceeding that the value of the retained units was $9,500 each. Briggs, therefore, has no equity and IHCC is substantially undersecured.

The stipulations described above between Briggs and Lend Lease, GMAC and IHCC each provide for adequate protection in the form of periodic cash payments to the creditors in the amount designed to compensate them for the deterioration or depreciation of the equipment occasioned by the automatic stay and Briggs' continued use of collateral. Each creditor argues that while these payments may offset the obvious costs to them of the debtors continued possession and use, it does not compensate them for the "time value" of their money lost because they have not been able to repossess their collateral, liquidate it, and ue to make payments on the automobiles as

re-invest the funds at current market rates. This "opportunity cost" theory has appeal if a strict economic analysis is applied, however, I am not convinced that Congress intended such a narrow perspective be taken by the Court, nor that it intended creditors to be compensated for *all* benefits lost as a result of the automatic stay.

## DISCUSSION

The creditors arguments in support of their contention that they must be compensated for the time value of their money in order to be adequately protected can be divided into two categories. First, the creditors argue that the automatic stay is an extraordinary remedy which Congress intended would delay enforcement of a secured creditors right to foreclose on its collateral only as long as it is compensated for the delay in enforcing those rights. To support this argument, the creditors assert that adequate protection is intended to counterbalance this extraordinary power and because the ability to foreclose and reinvest the proceeds is the essence of the secured creditors bargain, the "reinvestment value" of the collateral is as much a part of the value of the bargain as the market value of the property itself. Thus the creditors argue that both the market value and the reinvestment value of the property must be protected for the creditors to receive the "benefit of their bargain". The creditors allege that to hold otherwise, gives the court too much discretion and would produce anomalous results.

The creditors second argument is constitutional. They allege that failure to compensate them for the delay in enforcing their lien rights constitutes a taking of property without just compensation. They argue the constitution requires that the "present value" of their collateral be preserved. To support this argument the creditors analogize the operation of the automatic stay to condemnation.

These are essentially the same arguments which were considered by the Ninth Circuit provided by the original agreement.

Bankruptcy Appellate Panel in their recent decision in *Crocker National Bank v. American Mariner Industries, Inc. (In re American Mariner, Inc.)*, 27 B.R. 1004 (Bkrtcy. App. 9th Cir.1983), *("American Mariner")*[2] and by Bankruptcy Judge Ralph R. Mabey in *General Electric Mortgage Corp. v. South Village, Inc., (In re South Village, Inc.)*, 25 B.R. 987 (Bkrtcy.D.Utah 1982), *("South Village")*. Both of these decisions concluded, on the basis of the language of the Code and its legislative history, that Congress did not intend that the present value of money be protected, rather that adequate protection is one of the mechanisms included in the Code to balance the rights and obligations of a debtor and its creditors during the pendency of the case. The apparent intention of Congress was to "provide a balance whereby deferral of recourse to collateral would be attended by provisions for insuring maintenance of its value. This balance does not require an additional increment for market rate interest on the value of such collateral." *Crocker National Bank v. American Mariner Industries, Inc.*, 27 B.R. 1004, 1014 (Bkrtcy.App. 9th Cir. 1983).

The Bankruptcy Appellate Panel in *American Mariner* further concluded that this construction did not result in an unconstitutional deprivation of the creditors property without just compensation. It adopted Justice Douglas' conclusion in *Wright v. Union Central Life,* that adequate protection is a safeguard which protects the rights of secured creditors throughout the proceeding, to the extend of the value of their property and there is no constitutional claim for more. 311 U.S. 273, 278, 61 S.Ct. 196, 199, 85 L.Ed. 184 (1940).

As I noted earlier, while I would agree that the creditors arguments have a certain appeal from a strictly economic perspective, in the bankruptcy context, I believe the contrary conclusions reached in *American Mariner* and *South Village* are the better law.

I

The major focus of the creditors first argument is how "adequate protection" is defined. Section 362(d) provides in relevant part that a creditor may obtain relief from the automatic stay where a debtor fails to provide adequate protection. What constitutes adequate protection is described in § 361. Section 361 states,

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee[3] to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the *value of such entity's interest in such property;* or

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the *value of such entity's interest in such property;* or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of *the indubitable equivalent of such entity's interest in such property.*

(emphasis added).

Although Congress clearly intended § 361 to provide some guidance as to what constitutes adequate protection, ambiguity of the

---

**2.** Lend Lease acknowledges that the arguments set forth in their memorandum were prepared primarily by J. Ronald Trost and members of the lawfirm of Sidley & Austin, Los Angeles, California and were submitted to the Ninth Circuit Court of Appeals in connection with plaintiff Crocker's appeal of the Bankruptcy Appellate Panel's decision in *Crocker National Bank v. American Mariner Industries, Inc. (In*

*re American Mariner Industries, Inc.)*, 27 B.R. 1004 (Bkrtcy.App. 9th Cir.1983).

**3.** § 1107(a) gives the debtor in possession, subject to limitations not relevant here, "all the rights ... and powers, and shall perform all functions and duties ... of a trustee."

language used has generated debate over its meaning. As a consequence, a number of creditors have argued that the ambiguous language was intended and should be construed to include opportunity cost.[4] These arguments break down into essentially two categories, those which focus on "the value of an entity's interest in such property", language in § 362(1) and (2) and those which focus on the "indubitable equivalent" language of § 361(3).

### A

The arguments which focus on the "value" language of § 362(1) and (2) assert, as did Judge Hughes in his dissent in *American Mariner*, that creditors are entitled to the "benefit of their bargain" and resort to collateral is an essential component of the benefit of the bargain between a borrower and a secured lender. Where a creditor is denied the benefit of foreclosing, liquidating, and reinvesting the proceeds at the current market rate, they are deprived of part of their bargain and creditors believe they should be compensated for it. The creditors argue that the interest on the value of the collateral, the time value of their money is the appropriate form of compensation. *See Crocker National Bank v. American Mariner Industries, Inc. (In re American Mariner Industries, Inc.)* 27 B.R. 1004, 1017 (Bkrtcy.App. 9th Cir.1983). I think this interpretation is contrary to the

legislative history of § 361. This position requires a distinction to be drawn between the contractual rights and the value of tangible assets. *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),* 25 B.R. 987, 992 (Bkrtcy.D. Utah 1982).

The proponents of the opportunity costs theory read the term, "value" in § 361 to mean "cash value". In the legislative history on the other hand, the value of the interest in property appears to mean the value of the collateral itself.[5]

### B

Construing "value" to include opportunity cost as part of adequate protection would conflict with other provisions of the Code. A clear example of this conflict is the language of the Code and the creditors theory is found in §§ 502 and 506.[6]

Section 502 deals with the allowance of claims. Section 502(b)(2) suspends the accrual of interest on claims, both secured and unsecured upon the filing of a bankruptcy petition. "This rule is founded in fairness since delay in payment is an act of law, it should work no inequity. The onus of delay, as reflected in the time value of money, is born ratably by the parties." *In re South Village Corp.,* 25 B.R. 987, 997 (Bkrtcy.D. Utah 1982). *See* 3 Colliers on Bankruptcy, Paragraph 502.02(2) (15th Edition).

---

4. *See, e.g., Crocker National Bank v. American Mariner Industries, Inc., (In re American Mariner Industries, Inc.),* 27 B.R. 1004 (Bkrtcy.App. 9th Cir.1983); *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),* 25 B.R. 987 (Bkrtcy.D.Utah 1982); *In re Pine Lake Village Apartment, Co.,* 19 B.R. 819 (Bkrtcy.S.D.N.Y.1982). *Cf., Metropolitan Life Insurance Co. v. Monroe Park (In re Monroe Park),* 17 B.R. 934 (D.C.D.Del.1982); *United Virginia Bank v. Virginia Foundry Co. (In re Virginia Foundry Co.)* 9 B.R. 493 (D.C.W.D.Va. 1981); *Midatlantic National Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.)* 4 B.R. 635 (Bkrtcy.E.D.N.Y.1980).

5. The original commission proposal which was subsequently codified in § 361 describes "adequate protection" as protection, "to the extent of anticipated decrease in value of the collateral as a result of use." Report of the Comm. on

the Bankruptcy laws of the U.S.H.Doc. No. 93–137, pt. II at 237 (1973). This position represents a codification of cases such as *In re Bermec,* 445 F.2d 367 (2 Cir.1971) in which a debtor was permitted to use the collateral subject to periodic payments for the depreciation of hard security to approximately preserve the status quo.

*See also,* Hearings on H.R. 31 and H.R. 32 before the Subcomm. on Civil and constitutional rights of the House of Comm. on Judiciary, 94th Cong.2d Sess., Series 27, Pt III at 1763 (1976); *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)* 25 B.R. 987, 993–4 (Bkrtcy.D.Utah 1982).

6. See also discussion of conflicts with §§ 1124 and 1111(b) in *General Electric Mortgage Corporation v. South Village, Inc. (In re South Village, Inc.),* 25 B.R. 987, 997–1000 (Bkrtcy.D. Utah 1982).

Under § 502, claims are allowed to the extent they are enforceable against the debtor and property of the debtor as of the date of the filing of the petition. Claims for unmatured interest are specifically disallowed. § 506, however, provides an exception to the general rule of § 502.

§ 506 provides for the determination of secured status. § 506 states:

(a) an allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estates interest in such property . . . and is an unsecured claim to the extent that the value of such creditors interest . . . is less than the amount of such allowed claim.

(b) To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and reasonable fees, costs or charges provided under the agreement under which such claim arose.

Section 506(b) allows interest to accrue where a creditor is oversecured. This exception is inconsistent with the opportunity cost theory asserted by the creditors in two ways. First, the creditors' theory implies that a creditor, oversecured or undersecured would not only accrue interest but be paid interest at the market rate rather than the contract rate. This is clearly contrary to § 506(b) which allows for the accrual of interest on oversecured claims but only where it is provided for in the original contract.

Second, a negative inference may be drawn, from the fact that § 506(b) specifically provides for interest to accrue where a creditor is oversecured. Congress provided for interest to accrue to certain creditors, but did not intend interest to accrue or be paid to other creditors.

### C

The creditor's position is also contrary to the legislative history of § 361(3). The creditors rely heavily on Congress' inclusion of the "indubitable equivalent" language in § 361 as indicative of Congress' intention that creditors be compensated for, as adequate protection, the reinvestment value of their collateral as well as the depreciation or the deterioration of its market value. They base their argument primarily on the case of *In re Murel Holding Company,* 75 F.2d 941 (2 Cir.1935). This is the case from which the "indubitable equivalent" language was taken. In *Murel* Judge Learned Hand concluded that the trial court erred in staying a creditors enforcement of its liens where the plan proposed would require the creditor to forego all amortization payments for ten years, extend the due date until that time, with interest to be paid at 5½% during the extension period. The court, when considering requirements of § 207 of the prior act which required a plan to adequately protect a creditor who objected to a proposed plan, states,

[I]t is plain "adequate protection" must be completely compensatory; and the payments ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principle will scarcely be content with that; he wishes to get his money or at least his property. We see no reason to suppose that the statute was intended to provide him that in the interest of junior holders, unless by substitute of the most indubitable equivalent.

75 F.2d 941, 942 (2 Cir.1935).

Although *Murel* is frequently cited as defining "indubitable equivalent" to require complete compensation, including consideration of the time value of money or interest, I think such a construction is inappropriate in the context of relief from the automatic stay under the Code. *Murel* involves an analysis of confirmation standards under § 207(b)(5) of the Act. This analysis seems more analogous to § 1129 than to adequate protection in the context of § 361(3). Adequate protection as discussed in *Murel* and in § 1129 deal with the requirements of a

confirmation of a plan. Section 361(3) deals with adequate protection as an interim measure of protection. In fact, § 1129 requires a plan to provide a creditor with the present value of its secured claim unless the creditor agrees to something less.

The true focus of the *Murel* decision was the slim margin of security and the inability of the debtor to pay its way for a substantial period of time. In *Murel* the court held that a "better hope of success" would be necessary for the continuance of this stay to be appropriate. 75 F.2d at 943. The creditor failed to note that even the *Murel* court observed, "no doubt less will be required to hold up the suit for a short time until the debtor shall have a chance to prepare: much depends on how long he has had already and upon how much more time he demands." *In re Murel Holding Company,* 75 F.2d 941, 942–3 (2 Cir.1935). I think the result in *Murel* was justified, however, I also think it was fact specific and not a categorical imperative that a creditor be "completely compensated" by receiving its opportunity cost to be adequately protected.[7]

## II

In addition to the opportunity cost arguments made on the legislative history and language of the Code, the creditors also assert that failure to pay opportunity cost is unconstitutional. Essentially, they argue that where the stay deprives a creditor of access to collateral, it forces them to become involuntary lenders. They analogize this situation to condemnation. This argument fails because it presumes a taking.

The creditors discussed at length the case of *Louisville Stockland Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). That case found the Frazier-Lemke Act unconstitutional. The creditors focus on the holding in *Radford* that "the power of Congress to legislate on the subject of bankruptcy under Article I, Section 8, Clause 4 of the constitution is limited by the Fifth Amendment." 295 U.S. 555 (1935). However, bankruptcy, unlike the provisions of the Frazier-Lemke Act, merely stays rather than transfers ownership of property without just compensation. *Crocker National Bank v. American Mariner Corp. (In re American Mariner Industries, Inc.),* 27 B.R. 1007, 1010 (Bkrtcy.App. 9th Cir., 1983). *See also, Fort Worth Mortgage Co. v. Cantrup (In re Cantrup),* 32 B.R. 1004, 10 B.C.D. 1372 (D.Colo.1983).

Even Judge Hand in *Murel* recognized that there may be cases where compensation for temporary delay of the right to enforce a lien would not be required. *See, In re Murel Holding Company,* 75 F.2d 941, 943 (2 Cir.1935).

Congress was not unaware that delay in access to assets or distribution under the plan of reorganization could impose substantial economic penalties on creditors. Therefore, they provided the creditor remedies against undue delay. While not requiring the debtor to pay opportunity costs occasioned by the stay, Congress gave the creditors power to prevent the delay from becoming excessive or being abused.

For example, § 362(e) requires hearings on the relief from the automatic stay within 30 days of the filing or relief is automatically granted. This avoids the problem under

---

7. Although I think it is clear that the indubitable equivalent language in § 361(3) does not support the creditors argument for inclusion of opportunities cost as part of adequate protection, I am not certain what its function is. As noted earlier, the phrase was minted by Judge Learned Hand in *Murel.* Its inclusion in § 1129 of the Code seems to adopt the principle of that case. Its inclusion in § 361(3) appears to have been a compromise between the House's desire to provide a more flexible definition of adequate protection than the Senate was willing to accept.

Perhaps the phase was best described by Judge Mabey in *In re Alyucan Interstate Corp.,* when he states,

[I]ndubitable equivalence is not a method; nor does it have substantive content. Indeed, something "indubitable" is more than "adequate;" "equivalent" is more than "protection;" hence, the illustration may eclipse the concept. At best, it is a semantic substitute for adequate protection and one with dubious, not indubitable, application to the question of relief from the stay.

12 B.R. 803, 809 (Bkrtcy.D.Utah 1981).

the Act of relief hearings being taken under advisement indefinitely. Undue delay may also be avoided by motions to dismiss or convert a Chapter 11 case to a Chapter 7 case. *See* § 1112(b). The limitation on the exclusive opportunity for a debtor to file a plan in § 1121 of reorganization, is another example of a creditors weapon against undue delay. In light of these other antidotes for delay, I think it is clear that Congress intend these rather than opportunity costs to maintain the balance between the debtor's and creditor's interests.

## CONCLUSION

The position of an undersecured creditor who has not yet foreclosed on its lien is not changed merely by the filing of bankruptcy; only the forum and procedure for remedy are affected. I think this facilitates the preservation of the balance Congress has struck between its policy in favor or the rehabilitation of debtors and the property rights of creditors. A flexible definition of adequate protection is essential to insuring that the balance is tailored to the facts and circumstances of each case.

The creditors argue that this gives the court too much discretion. I do not agree. While creditors may be unhappy with the manner in which Congress reconciled the need of a debtor for "breathing space" to reorganize their affairs and the creditors desire for expeditious realization of their claims, Congress did attempt to insure the preservation of the tension between the two competing interests. The court's challenge is to insure that the balance is maintained.

In these three cases, the periodic cash payments to compensate the creditors for deterioration or depreciation of collateral which remains in the debtor's possession constitute adequate protection.

### THEREFORE, IT IS ORDERED:

The creditors request for payment of interest on the time value of their money as part of adequate protection is denied.