**In re PHILADELPHIA CONSUMER DISCOUNT COMPANY and Philadelphia Acceptance Corporation, Debtors.**

**PHILADELPHIA CONSUMER DISCOUNT COMPANY and Philadelphia Acceptance Corporation, Appellants,**

**v.**

**COMMERCIAL CREDIT BUSINESS LOANS, INC., Appellee.**

Civ. A. No. 83–4554.

United States District Court,
E.D. Pennsylvania.

Feb. 14, 1984.

Joseph S.U. Bodoff, Philadelphia, Pa., for appellants.

E. David Chanin, Philadelphia, Pa., for appellee.

## OPINION

CAHN, District Judge.

## I. PRELIMINARY STATEMENT

This is an appeal from an order of the Bankruptcy Court that denied the applica-

**1.** The filing of the petitions operated as an automatic stay upon the estate. 11 U.S.C. § 362.

**2.** Loan receivables are considered cash collateral under 11 U.S.C. § 363(a).

**3.** 11 U.S.C. § 506(a) provides as follows:
An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent · of the value of such creditor's interest in the

tion of the debtors for authority to use cash collateral, and in addition granted the secured lender relief from the automatic stay provision of the Bankruptcy Code. I have jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and will affirm the order of the Bankruptcy Court for the reasons set forth below.

## II. PROCEDURAL BACKGROUND

On May 2, 1983, debtors, Philadelphia Consumer Discount Co. and its wholly owned subsidiary, Philadelphia Acceptance Corp., filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*[1] On May 6, 1983, an order of joint administration in the two cases was entered.

On June 13, 1983, the debtors filed an application for authority to use cash collateral and to determine secured status. In their petition, debtors requested authority to use loan receivables[2] to renew loans and make new loans. These receivables are collateral for a line of credit extended to debtors since 1976 by Commercial Credit Business Loans, Inc. (hereinafter "CCBL"). In their June 13th application, debtors also requested that the Bankruptcy Court set the value of the collateral, and thus determine CCBL's allowed secured claim, under 11 U.S.C. § 506(a).[3]

On June 16, 1983, CCBL filed a complaint for relief from the automatic stay under §§ 362(a) and (e) of the Bankruptcy Code. The Bankruptcy Judge held hearings on the debtors' application on June 20 and 24, 1983, and on July 11, 1983 conducted a hearing on CCBL's complaint for relief from the auto-

estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

matic stay. On August 16, 1983, the Bankruptcy Judge denied the debtors' application to use cash collateral and granted CCBL's request for relief from the stay, 32 B.R. 322. This appeal followed.

## III. FACTS

CCBL, a commercial lender, extended a line of credit to the debtor-lenders under a loan agreement dated June 18, 1976, and renewed yearly thereafter. CCBL has been debtors' primary source of capital since 1976. As collateral for loans extended under this line of credit, the debtors granted CCBL a security interest in all notes receivable and proceeds generated by debtors' consumer and commercial loan-making business. Until January, 1982, CCBL permitted debtors to service this loan by making interest payments only, and no principal payments were made to that date.

Debtors had difficulty meeting their interest payments due to unfavorable lending conditions in Pennsylvania in 1981 (a prime lending rate of over twenty percent and a statutory maximum interest rate on consumer loans of 23.73 percent[4]), and, according to testimony by an officer of the debtors, were in default on their obligation. CCBL notified debtors in January of 1982 that it was freezing the line of credit and requiring debtors to make principal payments. Debtors continued making interest payments to CCBL and in addition began to liquidate the company through daily collection of accounts and sale of accounts. On June 23, 1982, CCBL notified debtors that in August the lending arrangement would not be renewed. On August 31, 1982, the agreement was terminated and the debtors were prevented from renewing loans or making new loans. CCBL did not immediately foreclose on its collateral, but instead permitted debtors to continue with an orderly liquidation of their accounts. Debtors

did so, and in the process sold off most of their "good" loans, leaving 112 loans of which 13 to 15 percent were more than 60 days delinquent as of the date of the bankruptcy petition. Out of total receivables of $1,203,000.00 outstanding on June 10, 1983, accounts worth $130,000.00 were over 60 days delinquent and accounts worth $400,000.00 to $450,000.00 were more than 30 days delinquent. In June of 1983 the number of delinquencies was increasing.

By May 2, 1983, the date of the Chapter 11 petition, debtors had reduced their obligation to CCBL from $1,700,000.00 to approximately $1,000,000.00.[5] The value of the remaining collateral was approximately $700,000.00, leaving CCBL undercollateralized by $300,000.00. Debtors filed for protection under Chapter 11 based on the belief that continuing to sell accounts and liquidate the business pursuant to CCBL's plan would result in no recovery for subordinated debenture holders who hold $200,000.00 in debt instruments of the company. In addition, present and former officers of debtors had guaranteed the CCBL loan, and the liquidation of the business as it was proceeding would leave those officers personally liable in the amount of $300,000.00.

## IV. DISCUSSION

The issue to be determined on this appeal is whether the protection plan offered by debtors in opposing CCBL's petition for relief from the automatic stay is adequate assurance that the value of CCBL's collateral will not depreciate. The Bankruptcy Judge held that it is not adequate and I agree.

### A. *Adequate Protection*

█ CCBL filed a petition for relief from the automatic stay under 11 U.S.C.

---

**4.** Agencies like the debtors operate by borrowing funds from an institutional lender at or above the prime rate of interest, and lending to the public at rates as high as state usury laws will permit. In the period of high prime and low state ceilings, debtors' profit margin was badly squeezed.

**5.** As of the date of the Chapter 11 petition, the principal amount owed was $987,450.81 with accrued interest to that date of $10,803.44.

§ 362(d)(1).[6] Under that section it is clear that once the petition is filed, the burden is upon debtors to prove the absence of cause for relief, and in addition to show that their plan for use of the collateral will "adequately protect"[7] CCBL's interest in that collateral. Debtors may not merely theorize that such protection might materialize. *Gauvin v. Wagner (In re Gauvin)*, 24 B.R. 578, 580 (Bkrtcy. 9th Cir.1982) (per curiam). *See also La Jolla Mortgage Fund v. Rancho El Cajon Assoc.*, 18 B.R. 283, 288 (Bkrtcy.S. D.Cal.1982) (*citing* 124 Cong.Rec. 32,396 [1978]).

The question of the sufficiency of protection offered as adequate is a matter of law, *In re Schaller*, 27 B.R. 959, 962 n. 2 (D.C.W.D.Wis.1983), and therefore this court must undertake an independent evaluation of that legal question, *Pierce-Phelps, Inc. v. Hollock (In re Hollock)*, 1 B.R. 212, 215 (D.C.M.D.Pa.1979).[8] The court must weigh the competing interest of the creditor's property interest, which may not be diminished, against the values promoted by the automatic stay, *i.e.*, a public policy to prevent the piecemeal dismantling of a

business through unilateral creditor action. *Chemical Bank v. American Kitchen Foods, Inc.*, 2 B.C.D. 715, 718 (Bkrtcy.N.D.Me. 1976).

In this type of case, in which the creditor is undercollateralized by a large amount, "the court must be more particular concerning the adequacy of the offered protection," *La Jolla Mortgage Fund v. Rancho El Cajon Assoc.*, 18 B.R. 283, 288 (Bkrtcy.S. D.Cal.1982).[9] The focus for the court in determining adequacy must be the projected stability of the value of the collateral, *First Federal Sav. & Loan Ass'n of Lima v. Shriver (In re Shriver)*, 33 B.R. 176, 182, 185 (Bkrtcy.N.D.Ohio 1983); *Chase Manhattan Bank v. Ramco Well Service (In re Ramco Well Service)*, 32 B.R. 525, 531 (Bkrtcy.W.D. Okl.1983).

## B. *"Interest" Entitled to Protection*

The initial question that this court must ask is the extent of the "interest" of the secured creditor entitled to protection under the Bankruptcy Code. Although Congress, through use of the bankruptcy laws, may not circumvent the Fifth Amend-

---

**6.** Section 362(d)(1) provides as follows:
  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section ... (1) for cause, including the lack of adequate protection of an interest in property of such party in interest ...

**7.** "Adequate protection" is defined in 11 U.S.C. § 361, and may be provided by making "periodic cash payments" to offset a decrease in the value of the creditor's interest in property, 11 U.S.C. § 361(1); by providing the creditor with an additional or replacement lien to offset such a decrease, 11 U.S.C. § 361(2); or by granting any other relief, with certain exceptions, "as will result in the [creditor's] realization ... of the indubitable equivalent of [its] interest in property," 11 U.S.C. § 361(3).

**8.** Of course, the Bankruptcy Court's factual findings must be affirmed unless clearly erroneous. *In re Perimeter Park Investment Assoc., Ltd.*, 616 F.2d 150, 151 (5th Cir.1980); Bankruptcy Rule 8013. The reviewing court may reverse in the presence of some testimony in the record supporting the Bankruptcy Judge's conclusions only if the court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

**9.** Although the presence of an equity cushion is the classic form of adequate protection, *Delaware Valley Sav. & Loan Ass'n v. Curtis (In re Curtis)*, 9 B.R. 110, 112 (Bkrtcy.E.D.Pa.1981), the lack of equity alone should not be determinative on that issue. Some courts have improperly narrowed their focus to the equity cushion, instead of making the necessary evaluation, first, of the stability of the collateral; second, of the likelihood of reorganization; and third, of the credibility of the debtor's protection plan. *See, e.g., Central Penn Nat'l Bank v. Zimmerman (In re Ludwig Honold Mfg. Co.)*, 33 B.R. 722, 723 (Bkrtcy.E.D.Pa.1983); *American Bank and Trust Co. of Pa. v. Ram Mfg. Co. (In re Ram Mfg. Co.)*, 32 B.R. 969, 971 (Bkrtcy. E.D.Pa.1983); *Provident Mut. Life Ins. Co. v. Winslow Center Assoc. (In re Winslow Center Assoc.)*, 32 B.R. 685, 687 (Bkrtcy.E.D.Pa.1983); *Presidential Commercial Fund, Inc. v. Jones (In re Jones)*, 26 B.R. 142, 144 (Bkrtcy.E.D.Pa. 1983); *Fairmont Foods Co. v. AZJZ, Inc. (In re AZJZ, Inc.)*, 22 B.R. 966, 968 (Bkrtcy.E.D.Pa. 1982).

ment guarantees against the taking of private property without just compensation, *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935), the creditor is entitled to protection only of his "allowed secured claim" under § 506 of the Code. When a creditor is oversecured, his allowed secured claim is the amount of the debt plus interest and expenses, 11 U.S.C. § 506(b); [10] but when the creditor is undersecured, as here, his allowed secured claim is equivalent only to the value of the collateral at the time the petition is filed, 11 U.S.C. § 506(a).[11] Thus, the "interest in property" of CCBL that must be protected by the debtor is the value of CCBL's collateral at the time of the petition, *i.e.,* $700,000.00.

The bankruptcy courts have held that, since § 506(b) makes no provision for interest to be added to the secured claim of an undersecured claimant, undersecured creditors are not entitled to protection of the "opportunity cost" or the "use value" of their collateral between the time the petition is filed and the time of the filing of the reorganization plan or liquidation of the estate.[12] These courts would limit the remedy to be afforded secured claim holders for undue delay in realizing their claims to either a motion to dismiss the Chapter 11 petition, or to a motion to convert that

petition to a Chapter 7 case under § 1112(b) of the Code. *In re Pine Lake Village Apt. Co.,* 19 B.R. 819, 828 (Bkrtcy.S.D.N.Y. 1982).[13] A different rule has been formulated by the two district courts to consider the issue, *Metropolitan Life Ins. Co. v. Monroe Park (In re Monroe Park),* 17 B.R. 934, 940 (D.C.D.Del.1982); *In re Virginia Foundry Co.,* 9 B.R. 493, 497–8 (D.C.W.D.Va.1981). The Court in *Monroe Park* concluded that adequate protection for an undersecured creditor requires some compensation for the loss of use of its money during the interim period between the filing of the petition and confirmation or liquidation. The court found that without such compensation, the value of the creditor's "interest in property" that must be adequately protected by the debtor would necessarily erode during the pendency of the stay. *In re Monroe Park,* 17 B.R. at 940 & n. 3. *See also In re Virginia Foundry Co.,* 9 B.R. at 498.

I need not choose between these two approaches, because debtors here have not met even their minimum burden of showing that, under their protection plan, the value of the collateral will remain stable.

### C. *The Debtors' Plan*

■ The debtors' plan is the following. Debtors propose to collect the cash proceeds

---

**10.** Section 506(b) provides as follows:
> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose.

**11.** *See Metropolitan Life Ins. Co. v. Monroe Park (In re Monroe Park),* 17 B.R. 934, 939 (D.C.D.Del.1982); *First Federal Savings and Loan Ass'n of Lima v. Shriver (In re Shriver),* 33 B.R. 176, 181 (Bkrtcy.N.D.Ohio 1983); *Aegean Fair, Inc. v. Commonwealth of Mass. (In re Aegean Fair, Inc.),* 33 B.R. 745 (Bkrtcy.D.Mass. 1983); *In re Pine Lake Village Apt. Co.,* 19 B.R. 819, 824–25 (Bkrtcy.S.D.N.Y.1982); *Credit Alliance Corp. v. Nixon Machinery Co. (In re Nixon Machinery Co.),* 9 B.R. 316, 317 (Bkrtcy.E.D. Tenn.1981).

**12.** *See In re Briggs Transp. Co.,* 35 B.R. 210, 3 Bankr.Rep. (CCH) ¶ 69,494, at 83,769 (D.Minn. 1983); *In re Shriver,* 33 B.R. at 182–4 (*citing*

legislative history); *Barclays Bank of N.Y., N.A. v. Saypol (In re Saypol),* 31 B.R. 796, 800 (Bkrtcy.E.D.N.Y.1983) ("That the secured creditor may, in a deficiency situation, receive no interest reflecting the loss of the use of its funds while stayed from foreclosure results not from the imposition of the stay, but from the inadequacy of the collateral bargained for by the secured creditor."); *In re Pine Lake Village Apt. Co.,* 19 B.R. at 827 ("[A]s long as the collateral value remains stable the debtor cannot be called upon to compensate the mortgagee for the delay he must endure before parlaying his foreclosure proceeds into a better investment. Adequate protection relates to preservation of the collateral value, and not to compensation for the loss of a better business opportunity.")

**13.** A further as yet unexplored possibility is that the "use value" of an undersecured creditor's claim could be assigned super-priority under § 507(b) of the Code.

of their current outstanding loans as accounts are repaid and reloan cash to debtors' existing or anticipated customers. Debtors would grant CCBL a security interest in these future unidentified accounts. In addition, debtors assert that under their plan they will continue to pay CCBL $10,000.00 per month, approximately equivalent to the interest on the debt paid to CCBL prior to the filing of the bankruptcy petition. Under the debtors' plan, however, these monthly payments would be applied to reduce the principal of the debt and would not constitute interest. These cash payments would offset any decrease in the value of the collateral, according to debtors, and thus would constitute "adequate protection" of that collateral under § 361(1).

Under the plan presented to the court, debtors would renew eight loans per month for 12 months equivalent to 96 renewals. At the time of the hearing on the petition for relief from the automatic stay, debtors were monitoring only 112 accounts, and of those, 13 to 15 percent were over 60 days delinquent and approximately 40 accounts were over 30 days delinquent. The plan, therefore, would involve the continued investment of CCBL's collateral in a substantial number of delinquent accounts.[14]

The debtors presented charts and other testimony to show how this plan could lead to enhancement of the collateral, producing $51,500.00 monthly (sufficient funds to make payments to CCBL of $10,000.00 each month, pay operating expenses of $8,000.00 per month, and use the remaining $31,000.00 a month for new loans and renewals). The debtors, however, had not investigated any of their accounts to determine how many, if any, were renewable. Indeed, the debtors had not even determined the number of accounts coming due in the next year. In addition, debtors did not identify any potential new customers and presented no proof that they could generate new loans.[15]

In a case similar to the instant one, *Rhode Island Hospital Trust Nat'l Bank v. Ocean State Optical Co. (In re Ocean State Optical Co.),* 22 B.R. 893 (Bkrtcy.D.R.I. 1982), the Bankruptcy Court held that where the creditor was undersecured, the debtor had no offer of outside capital, and the debtor's offer consisted solely of speculation as to future increased sales and lower expenses, the debtor fell "far short of making any reasonable showing that the secured creditor is adequately protected." *Id.* at 895. It is true that in *Ocean State,* the debtor made no offer of payment to the creditor, while debtors here have offered CCBL $10,000.00 per month. The existence and security of those monthly payments, as well as the continued integrity of the collateral, however, are wholly dependent on the success of debtors' protection plan; and unfortunately the debtors have presented not proof of the feasibility of their plan but mere speculation.

The debtors rely on the case of *Stein v. United States Farmers Home Admin. (In re Stein),* 19 B.R. 458 (Bkrtcy.E.D.Pa.1982) to support their position. In that case, the court ruled not on a secured creditor's petition for relief from the automatic stay but on the debtor's petition for use of cash collateral. The court granted that petition by virtue of its conclusion that the collateral there at issue—livestock and crops—would, in the natural scheme of things, increase. *Id.* at 460. In contrast, loan receivables, especially when cost of collection and overhead are considered, do not multiply by themselves.

The debtors have presented evidence that, following the *Stein* ruling on cash collateral, the collateral value actually decreased due to some natural disaster, and they argue that the fact that the *Stein*

---

**14.** Debtors' major means of securing the safety of CCBL's capital invested in these new loans would be to obtain junior liens on real estate of the borrowers whose fair market value is twice that of the loan. I do not agree that junior liens on real estate represent adequate security for CCBL.

**15.** The debtors did state that with the raising by Pennsylvania of the interest ceiling on consumer loans to 27 percent and the halving of the prime rate their success was more likely.

952

collateral could and did deteriorate makes this case and *Stein* identical. I do not agree. Without question, judicial assessment of the intangibles involved in projecting possible future collateral impairment risk is a crude and uncertain process. *See Chemical Bank v. American Kitchen Foods, Inc.,* 2 B.C.D. 715, 720 (Bkrtcy.N.D.Me. 1976). The court must make this initial decision, however, based on probabilities and common sense. The distinction between livestock and loan receivables is clear.

In summary, I find that CCBL's collateral is inherently unstable; that debtors have the burden of presenting a plan for use of collateral that adequately protects CCBL's interest; and that debtors have not met that burden, since their plan is insufficiently specific as to crucial details, and is based in large measure upon the continued investment of the collateral in delinquent accounts.

In addition, the conclusion is inescapable that debtors here have used the device of Chapter 11 merely to delay CCBL's foreclosure proceedings. This fact weighs against the relief debtors request. *Federal Nat'l Mortgage Ass'n v. Pelzer (In re Pelzer),* 15 B.R. 73, 74–5 (Bkrtcy.E.D.Pa.1981). The debtors state that their main purpose in filing under Chapter 11 was to slow down the liquidation of their receivables and to renew old loans and make additional loans in order to make their receivables more attractive for a potential future buyer. Their ultimate goal, they stated, was to pay CCBL in full. Although I am sympathetic to debtors' plight, I can find no fault in the creditor's preference for recovering its $700,000.00 in collateral now, rather than waiting the one to two years projected by debtors for some ephemeral complete recovery. Accordingly the judgment of the Bankruptcy Court will be affirmed, and an appropriate order will be entered.