In re CRADDOCK–TERRY SHOE COR-
PORATION, dba Hill Brothers, Bona
Fide Shoe Factory Outlet, Massey
Shoes, Country Cobbler, Herold's
Shoes, The Shoe Room, Comfort Un-
limited and Perfect Pair, Debtor.

LINCOLN NATIONAL LIFE INSUR-
ANCE COMPANY and Westinghouse
Credit Corporation, Plaintiffs,

v.

CRADDOCK–TERRY SHOE
CORPORATION,
Defendant.

Bankruptcy No. 687–01155.
Motion No. 687–01155(3).

United States Bankruptcy Court,
W.D. Virginia,
Lynchburg Division.

May 26, 1988.

See also, Bkrtcy., 91 B.R. 392.

J. Leyburn Mosby, Jr., Local Counsel,
Lynchburg, Va., Antoinette C. Emery, for
Lincoln Nat.

Ernest K. Geisler, Jr., Richmond, Va., for
Westinghouse.

Michie, Hamlett, Donato & Lowry, Local
Counsel, Charlottesville, Va., Alan Kolod,
New York City, for debtor.

George H. Fralin, Jr., Local Counsel,
Lynchburg, Va., for Creditors' Committee.

M. Caldwell Butler, Roanoke, Va., for
First Nat. Bank of Chicago.

A. Carter Magee, Jr., for Glenfed Finan-
cial Corp.

## MEMORANDUM OPINION

WILLIAM E. ANDERSON,
Bankruptcy Judge.

The plaintiffs, Lincoln National Life In-
surance Company ("Lincoln") and Westing-
house Credit Corporation ("Westing-
house"), have moved the Court to lift the
automatic stay imposed by section 362(a) of
the Bankruptcy Code, 11 U.S.C. § 362(a), or
in the alternative, to provide Lincoln and
Westinghouse adequate protection for cer-
tain collateral in which they have a security
interest. The collateral at issue is the cus-
tomer mailing lists, catalogues, and certain
trademarks of Hill Brothers, a division of
Craddock–Terry Shoe Corporation ("Crad-
dock–Terry"), the debtor.

## BACKGROUND FACTS

On April 30, 1986, the plaintiffs, Lincoln
and Westinghouse, loaned the debtor, Crad-
dock–Terry, $9,000,000. As security for
that loan, Lincoln and Westinghouse ob-
tained a security interest in the mailing list,
customer list, catalogues and four trade-
marks ("the collateral") of Hill Brothers, a
mail-order division of Craddock–Terry.

Debtor's Chapter 11 petition was filed on October 21, 1987. Craddock–Terry has shut down all its operations, except for Hill Brothers.

As of the petition date, debtor owed Lincoln and Westinghouse $9,587,812.50. The debtor does not dispute that Lincoln and Westinghouse have a valid and perfected lien on the mailing list, customer list, catalogues and trademarks of Hill Brothers. The collateral is worth less than the amount owed Lincoln and Westinghouse. In fact, the debtor had on the petition date, and still has, no equity in the collateral.

On January 5, 1988 Lincoln and Westinghouse obtained a court order authorizing a Bankruptcy Rule 2004 examination of the debtor. The examination and document production was conducted during January. Concerned that the value of their collateral appeared to be seriously declining, Lincoln and Westinghouse originally filed their motion for relief from stay on March 1, 1988. Certain procedural defects with regard to the filing of the motion existed on that date, but were cured on March 22, 1988. The hearing on the motion, originally scheduled for April 21, 1988, was continued to May 4, 1988, and final arguments were heard on May 10, 1988.

The evidence introduced at the hearing indicates that, during the chapter 11 case, Hill Brothers has experienced a serious cash flow problem which has reduced the number of orders which can be filled (the fill rate), cut in half the number of spring catalogues planned to be mailed, and reduced the rate at which new names are added to the Hill Brothers mailing list. In addition, returns of merchandise have increased. These factors have resulted in a serious decline in the value of the collateral.

The plaintiffs presented evidence that on the date debtor's petition was filed, before the adverse impact of the cash flow problems and the list management problems, the value of the mailing list in place and in use at Hill Brothers, was $8.7 million, but that its value on April 30, 1988 was $5.7 million. Their expert at trial had used the same valuation method as that used by an accounting firm whose earlier appraisal the debtor had used to obtain the loans. He testified that he had used a method appropriate for valuing a mailing list in use by a company, known as the discounted cash flow method. The resulting value is the value to the business which is using the list. A mailing list is carefully built up over the years, by adding names each year, and developing an active list of persons who like and buy the particular product of the company. It's value in place to the company using it is necessarily much greater than to an outside buyer or renter.

The debtor presented its own expert testimony from an individual heavily involved in the direct marketing industry. The debtor's expert stated that the fair market value of the list, if sold to other companies, was $700,000 on the petition date and $330,000 as of the hearing date. He utilized a model containing twelve factors from which he calculated the value of the list. These factors included expected revenues and expenses, customer attrition, rental income, comparison to outside lists, and customer affinity for the debtor's product.

Debtor filed a plan of reorganization on or about May 3, 1988. No disclosure statement has been filed. The debtor is currently seeking financing commitments from certain other creditors who hold liens in the proceeds of the recent sales of the bulk of Craddock–Terry assets other than Hill Brothers, although it claims to be able to effectuate its reorganization without outside capital.

## DISCUSSION

Bankruptcy Code section 362(d) provides relief from the stay imposed by section 362(a) in either of two circumstances. The stay will be lifted "for cause, including the lack of adequate protection of an interest in property of [a] party in interest." 11 U.S.C. § 362(d)(1). The stay will also be lifted "with respect to a stay of an act against property under subsection (a) of this section, if—(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effec-

tive reorganization." 11 U.S.C. § 362(d)(2). Lincoln and Westinghouse have asserted that they are entitled to relief under either part of section 362(d). The debtor claims to the contrary that its mailing list is vital to its reorganization and that it has offered adequate protection for any decline in the collateral's value. The court will consider sections 362(d)(1) and 362(d)(2) in reverse order.

## I. Section 362(d)(2)

■ Neither party disputes that Craddock–Terry has no equity in the collateral. The debt secured by the collateral is greater than $9,000,000, and although the parties have widely divergent views of the value of the collateral for purposes of this motion, each places a lower value on it than the amount of the debt. "Equity" is defined as the amount by which the value of the collateral exceeds the debt it secures. *Matter of QPL Components, Inc.*, 20 B.R. 342, 344 (Bankr.E.D.N.Y.1982). Thus the debtor has no equity in the collateral and the first requirement of section 362(d)(2) is met.

Each party also agrees that if the debtor can possibly reorganize, this collateral is essential to its survival. Lincoln and Westinghouse claim, however, that even if the debtor retains and uses the collateral, no *effective* reorganization is possible. In short, Lincoln and Westinghouse have no faith in the debtor's proposed plan for reorganization or its proposed business plan. They point to reduced catalog mailings and the reduced fill rate for customers' orders since the initiation of bankruptcy proceedings, both of which have caused the decline in value of the mailing list and, therefore, of the business itself.

The debtor, on the other hand, while admitting that its fill rate and catalog mailings have decreased, introduced evidence that the intrinsic value of the mailing list has not been irreparably harmed. The debtor's expert testified that an infusion of capital appropriately applied to the mailing list could revive the list's value, and that he had in fact seen this occur in a similar situation. The debtor's own representative testified that approximately $4,000,000.00

would be available to the debtor from the recent sale of the bulk of the company's assets to The Old Time Gospel Hour and to T/W Properties. He further testified that $900,000.00 of this influx of cash was designated for revitalization of the mailing list, and thereby, the company.

Since the filing of the debtor's petition the general theme of this reorganization has been to sell most of the company's assets and use the proceeds to reorganize the company's Hill Brothers division into a viable entity. The debtor has finally reached the point where it will have capital with which to effect those plans. The law is clear that a court "should not precipitously sound the death knell for a debtor by prematurely determining that the debtor's prospects for economic revival are poor." *In re Shockley Forest Indus., Inc.*, 5 B.R. 160 (Bankr.M.D.Tenn.1980). The evidence before the court as yet gives no basis for a conclusion that this reorganization is no longer in prospect, and therefore the court finds that the collateral at issue here is necessary to an effective reorganization. *See United Savings v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Consequently, the automatic stay will not be lifted pursuant to section 362(d)(2).

## II. Section 362(d)(1)

Lincoln and Westinghouse are entitled to relief from the stay, however, if the debtor cannot satisfy section 362(d)(1) by providing adequate protection for the interest of Lincoln and Westinghouse in the collateral. The debtor has offered replacement liens in all its assets, which it claims will provide adequate protection either from the date of the motion or, if necessary, from the date of the petition. The parties agree that the value of the collateral has declined since the date the petition was filed and also since the date the motion was filed. They disagree as to the amount of decline in value and as to the date from which adequate protection is necessary.

The major focus of the parties during the hearing on this motion and in their final arguments was on the proper value to assign to the collateral at the various stages

herein. The Bankruptcy Code provides no specific guidance as to the standard to be used to value property for purposes of providing creditors adequate protection with respect to section 362(d). Section 361 establishes three non-exclusive methods of providing adequate protection of a creditor's interest in property, but specifies no means for valuing that interest. Section 506(a) states that the value of a creditor's interest in the estate's interest in property "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest," 11 U.S.C. § 506(a), but gives no other insight into how such value should be determined.

Consequently courts have looked to the legislative history behind these two sections to find reasonable and proper methods of valuation. The legislative history of section 506(a) establishes that valuation methods should not be rigid:

> "value" does not necessarily contemplate forced sale or liquidation value of collateral; nor does it alway imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 356 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6312. The legislative history of section 361 presents the same idea:

> The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development.... [T]his flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.
>
> Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes although forced sale liquidation value will be a minimum.

> In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 54 (1978), U.S.Code Cong. & Admin.News 1978, 5840. *See also* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 338–40 (1977). Courts have applied this flexibility by attempting to determine "the most commercially reasonable disposition practicable in the circumstances," the standard espoused by Judge Conrad Cyr in *In re American Kitchen Foods, Inc.*, 2 B.C.D. 715, 722 (Bankr.N.D.Me.1976). *See e.g. Bank Hapoalim B.M. v. E.L.I., Ltd.*, 42 B.R. 376, 379 (N.D.Ill.1984); *Matter of QPL Components, Inc.*, 20 B.R. 342, 345 (Bankr.E.D.N.Y.1982); *In re Shockley Forest Indus., Inc.*, 5 B.R. 160, 162 (Bankr.N.D.Ga.1980).

In order to determine the most commercially reasonable disposition practicable, the court must follow the directive of section 506 and consider the purpose of the valuation. The purpose of adequate protection "as stated in the legislative history [of section 361] ... is to insure that the secured creditor receives in value essentially what he bargained for." *In re Ram Mfg., Inc.*, 32 B.R. 969, 971 (Bankr.E.D.Pa. 1983). Therefore "adequate protection for a secured creditor means that the creditor must receive the same *measure* of protection in bankruptcy that he could have had outside of bankruptcy although the *type* of protection may differ from the bargain initially struck between the parties." *Id.* at 972. (quoting *In re Winslow Center Assoc.*, 32 B.R. 685, 688 (Bankr.E.D.Pa.1983)) (emphasis in original). In other words, the value of the interest of Lincoln and Westinghouse in the collateral is equivalent to what they could have recovered through foreclosure, had the debtor defaulted but not filed its petition for Chapter 11 relief. The benefit initially bargained for, and to be protected under sections 361 and 362, was the value obtainable from the most commercially reasonable disposition of the

collateral within the context of foreclosure proceedings.

Each side put on evidence as to the value of the collateral. Lincoln and Westinghouse presented evidence as to the value the collateral would contribute to the price of the business if the business were sold as a going concern, and referred to this as "going concern" value. Their experts used a discounted cash flow analysis which essentially amounted to determining the net of projected revenues and expenses associated with the collateral in the future, and reducing the result to a present value. This capitalization represented the value of the collateral to its owner, the debtor. The plaintiffs' witness testified that in his opinion the value of the collateral to the debtor was approximately $8.7 million prior to bankruptcy, but that it had declined to approximately $5.7 million on April 30, 1988, four days before the hearing.

This type of analysis, however, is inappropriate for the purposes of this motion. Had the debtor defaulted prior to the initiation of bankruptcy proceedings, Lincoln and Westinghouse would not have had the right to force a sale by Craddock–Terry of the entire Hill Brothers division in order to enforce their right of foreclosure. Thus this evidence is irrelevant.[1]

Much of the case law does advocate using "going concern" value if a debtor is reorganizing, usually when the collateral is of a type the debtor itself might be expected to sell, such as inventory or old equipment. In these cases, including the cases cited by Lincoln and Westinghouse, however, "going concern" value generally signifies fair market value based on an arms-length transaction between a willing buyer and a willing seller, not the value added by

the collateral to a sale of the entire business were the business to be sold as a going concern. See Bank Hapoalim v. E.L.I. Ltd., 42 B.R. 376 (N.D.Ill.1984); In re Kids Stop of Amer., Inc., 64 B.R. 397, 401–02 (Bankr.M.D.Fla.1986) (going concern of inventory equated to retail value); In re Automatic Voting Machine Corp., 26 B.R. 970, 972 (Bankr.W.D.N.Y.1983) (going concern value of equipment equated to fair market value); Matter of QPL Components, Inc., 20 B.R. 342, 345 (Bankr.E.D.N.Y.1982) (going concern value of inventory equated with "the net recovery realizable from its disposition as near as may be in the ordinary course of business"); In re Xinde, 13 B.R. 212, 214 (Bankr.D.Mass. 1981) (going concern value equated to fair market value).

In one case cited by the plaintiffs, In re Helionetics, Inc., 70 B.R. 433 (Bankr.C.D. Cal.1987), the collateral included subsidiaries of the debtor which that court found were likely to be sold as going concerns in the event of foreclosure. In that case it was appropriate to value the collateral as Lincoln and Westinghouse suggest; nonetheless, that analysis is improper in this case.[2]

A customer list, as an asset, is a strange hybrid. Although actually represented by a physical asset (the list), its worth is basically as an intangible. The utility of the list results both from Craddock–Terry's established reputation and service, and from the inclination of the particular consumers on the list to purchase shoes, of the kind and quality which Craddock Terry sells, from Craddock–Terry. The testimony indicated that the value of the list is far greater to Craddock–Terry than to anyone else. The debtor's expert testified that even com-

---

1. Collier also disapproves of this type of valuation on the ground that it is unreliable (as did the debtor), stating that "some cases have mistakenly attempted to apply Chapter X valuation concepts to determinations of value in stay or use of collateral litigation. Valuation in Chapter X cases, required by the presence of the absolute priority rule, was to be a going-concern value based upon a capitalization of earnings. Since such a standard requires a capitalization of future earnings it will rarely, if ever, be appropriate at the outset of a case." 2 Collier on

Bankruptcy ¶ 361.02 (15th ed. 1987) (footnotes omitted).

2. The plaintiffs also cite In re Fiberglass Indus., Inc., 74 B.R. 738 (Bankr.N.D.N.Y.1987) in which the court used the value of the collateral to the debtor to determine its value according to section 506. That valuation, however, was for the purpose of determining the amount the creditor would be paid upon the effective date of the plan, not the value to be protected under sections 361 and 362.

petitors in the shoe business would not value the list as highly as Craddock–Terry for various reasons, including the fact that crossover with their own lists could be as high as fifty percent.

█ The debtor did introduce evidence of the value of the list if sold through an arms length transaction. The debtor's expert testified that this was not a "fire-sale" value, but indeed the fair market value. He used a model which is widely used in the direct marketing industry to determine mailing list values for third parties. His analysis took into account a variety of factors including not only list maintenance expenses and revenues, but also customer attrition, customer affinity for Craddock–Terry, and replacement cost, among others. His appraisal indicated that the collateral had a fair market value of not more than $700,000 as of the petition date, not more than $500,000 as of February 1988, and not more than $330,000 as of the hearing date. The Court finds this evidence to be credible and, as to the value of the collateral, the only evidence of the most commercially reasonable disposition practicable in these circumstances.

█ Since there is no dispute that the debtor has no equity in the collateral or that its value has declined during these proceedings, the debtor must provide adequate protection to Lincoln and Westinghouse. The final question presented in this case is the date from which adequate protection is required. Lincoln and Westinghouse argue that they should be protected from the decrease in value of the property resulting from the stay in its entirety, and therefore from the date of the petition. The debtor contends that relief should only cover the period of decline following the date these creditors filed their motion for relief.

The debtor, citing *In re Greives*, 81 B.R. 912 (Bankr.N.D.Ind.1987), contends that to allow a creditor adequate protection from the commencement of the case, even though the creditor does not formally request such protection until some months later, would place an undue burden on the debtor by forcing it to make back payments for an arrearage which the debtor didn't know was accruing. The debtor also claims that such a rule would encourage secured creditors to "sit on their rights" rather than acting to preserve their security. These arguments are not persuasive.

To the contrary, to adopt the rule which the debtor suggests would be even more harmful to the purposes of bankruptcy law. Such a requirement would force creditors to rush to the courthouse as soon as they learn of a debtor's petition in order to ensure that they obtain adequate protection from as early a date as possible. The resulting litigation would likely be prodigious, and certainly would interrupt the expected "breathing space" which debtors normally enjoy after a petition is filed. Surely a debtor in possession will do all it can to preserve the value of all property of the estate whether encumbered or not. Such a requirement, even absent a formal motion by a secured creditor, and even from the commencement of the case, is consonant with bankruptcy policies.

To the extent that the reasoning in *Greives* is attractive, that case is also distinguishable from the case at bar. The collateral in that case was equipment which, unlike a mailing list, was certainly depreciating over a predetermined lifetime. The creditor had already repossessed the collateral, and on the debtor's motion for emergency hearing for turnover, the court ordered the debtor to make a $1000 payment to the creditor as interim adequate protection, and also required written proof of insurance covering the collateral. The creditor itself also had delayed the hearing on the matter.

Moreover, case law has overwhelmingly established that what is protected is the decrease (in value) attributable to the stay, and therefore since the filing of the petition. *E.g. In re Philadelphia Consumer Discount Co.*, 37 B.R. 946, 950 (E.D.Pa. 1984) (and cases cited therein); *In re Pine Lake Village Apt. Co.*, 19 B.R. 819, 825 (Bankr.S.D.N.Y.1982); *In re Alyucan Interstate Corp.*, 12 B.R. 803, 808 (Bankr.D. Utah 1981). The other cases cited by the debtor, *In re Ahlers*, 794 F.2d 388 (8th

Cir.1986) *rev'd* on other grounds, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *Grundy Nat. Bank v. Tandem Mining Corp.*, 754 F.2d 1436 (4th Cir.1985); and *In re Island Helicopter Corp.*, 63 B.R. 809 (Bankr.E.D.N.Y.1986), all concerned protection of lost opportunity costs resulting from imposition of the stay. In the latter case, protection of lost opportunity costs was refused and the court also found that the debtor already *was* providing adequate protection of the collateral itself. As for the other two, those opinions concerned only the date from which to provide protection for lost opportunity costs, an entirely different issue.

## CONCLUSION

The Court finds that Lincoln and Westinghouse are entitled to adequate protection for all decline in the value of the collateral since the petition date. The value of the collateral on that date, for the purposes of this motion, was $700,000. The debtor has offered replacement liens in all its remaining assets, which its representative testified are worth in excess of $2,000,000 (not including $7,000,000 in accounts receivable). Therefore the automatic stay imposed by 11 U.S.C. § 362(a) will remain in effect, and this court will enter an order directing the debtor to execute a security agreement, all necessary financing statements, and any other supporting documents necessary to perfect a valid security interest in remaining assets in which the estate has an aggregate equity of no less than $700,000, in favor of Lincoln and Westinghouse, to secure the same indebtedness secured by the collateral at issue here.